IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| JAMES BRAGG, DOUG DOWNS, GARY DUITSMAN, TIM DUITSMAN, BARRY EAKLE, RANDY JOHNSON, STEVE KNOLL, DOUG SEIMER, PHILLIP TRAVELSTEAD, and MARVIN WEISS, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 05-3259 |
| TIMOTHY MARTIN, ROBERT MILLETTE, BRIAN PIERSMA, SCOTT DOUBET and JOSH HARTKE, | ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION

RICHARD MILLS, U.S. District Judge:

Pending before the Court is the Defendants' motion for summary judgment.

## I. INTRODUCTION

The Plaintiffs were all employed by the Illinois Department of Transportation ("IDOT") as part of the Department's 2003-2004 winter program. Since at least the 1980's, IDOT has maintained a program of

hiring people on a temporary basis during the winter months.  There are primarily two positions for this program.  One position is called "snowbird," sometimes referred to as "hourly."  These individuals are called out on an as-needed basis to plow snow.  They are paid by the hour.  The other position is called "full-time temporary," sometimes referred to as "salaried" position.  Those employees work full-time during the winter season.  Both the snowbirds and full-time temporary employees were hired to begin work sometime around October or November and continued to work until about March or April of the following year.  If, for example, a winter helper worked from November of 2001 through April of 2002, then that would be considered the 2001-02 season.

The Plaintiffs each worked in the program prior to the election of Governor Rod Blagojevich.  During the 2003-04 program, the Plaintiffs worked as full-time temporary employees, which means that they worked five days per week for approximately six months a year.

In this lawsuit, the Plaintiffs alleged that they were not offered the full-time temporary employment in 2004-05 because of their political

2

affiliations, in violation of their First Amendment rights.  The Defendants claim that they are entitled to summary judgment for the following reasons: (1) they were not personally involved in the alleged constitutional deprivation; (2) the Plaintiffs' political affiliations were not a motivating factor in their not being hired into the full-time temporary positions for the 2004-05 winter program, as the Defendants were not aware of the Plaintiffs' political affiliations; and (3) Plaintiffs cannot show that the proffered reason for their not being hired was pretextual.

## II. FACTUAL BACKGROUND

### (A)

Rod Blagojevich, a Democrat, was inaugurated as Governor of the State of Illinois in January of 2003.  Timothy Martin, one of the Defendants, became Secretary of IDOT in the same month.  Defendant Brian Piersma, as Section Manager in the Bureau of Personnel Management, was not in any manner involved in the Winter Program for the 2003-04, 2004-05 or 2005-06 seasons.  Robert Millette, a Defendant, began with the Department's Division of Finance and Administration in February of 2003.

At the time Martin and Millette began with IDOT, the 2002-03 Winter Program was already underway with all hiring decisions having been made in 2002.

The 2003-04 Winter Program was the first under Martin and Millette. The Defendants allege that Martin and Millette decided to make a change to the winter program application for full-time temporary and hourly positions, with the hope of casting a wide net to get the largest, most qualified applicant pool. The Plaintiffs dispute that the change was made for that reason. The hiring process for the 2003-04 Winter Program was based out of the Department's central office in Springfield, rather than in the individual districts. Applicants completed the updated application/questionnaire and forwarded it, along with letters of recommendation, to Springfield to be scored. Under this process, each of the Plaintiffs was hired as a full-time temporary employee for the 2003-04 Winter Program.

(B)

Plaintiff Marvin Weiss, a Republican, has worked and sought

4

employment in Rock Island County. Weiss began working for IDOT as a snowbird in the fall of 1987. He became a full-time temporary employee in the 1991-92 season and held that position through the 2003-04 season. Weiss applied for a such a position for the 2004-05 season but was not hired.

Plaintiffs James Bragg, Doug Downs, Gary Duitsman, Tim Duitsman, Barry Eakle, Doug Seimer, Steve Knoll, and Randy Johnson sought employment in various counties in District 5. Gary Duitsman is not affiliated with a political party. Tim Duitsman is an independent. Bragg, Downs, Eakle, Johnson, Knoll, and Seimer are Republicans. Plaintiff Philip Travelstead worked and sought work in Johnson County in District 9. Travelstead is not a member of a political party.

Bragg began working for the IDOT winter program in 1992. He began as a snowbird and became a full-time temporary employee during the 1999-00 season. Each year, he was able to get the job by simply filling out an application. The first time Bragg interviewed was for the 2004-05 season. He was interviewed by Josh Hartke, the Administrative Manager for IDOT's

District 5 from July 2003 through September 2006.  Hartke is a member of the Democratic party.  Bragg was not hired that season.  Bragg was hired again as a full-time, temporary employee for the 2006-07 season.  That year, the number of such positions went from three to ten.

Downs was a snowbird from 1991 through 1998 and was hired as a full-time temporary employee in the fall of 1998.  He worked in that capacity until the conclusion of the 2003-04 season.  Downs primarily worked out of the Phaethon storage facility in Vermillion County.  The first time that he had to interview for the position was the 2004-05 season.  The interview was conducted by Hartke over the phone.  Downs was not hired as a full-time temporary employee that year, even though there were more positions available than in the previous year when he was hired.

Gary Duitsman started working the IDOT winter program in November of 1992.  He started out as a snowbird and worked each winter in that position until November of 1998 when he became a full-time temporary employee.  He worked out of the Leverett facility in Champaign County.  Gary Duitsman was interviewed by Hartke for a position during

the 2004-05 season but was not hired.  This was the first time he was ever interviewed for the position.  For the 2004-05 season, there were only two full-time, temporary employees.  In prior years, there had been three.  Gary Duitsman applied for a position for the 2005-06 season but was not hired. He was rehired for the 2006-07 season.  That year, there were eight full-time temporary employees hired to work out of the Leverett facility.

Tim Duitsman was hired as a snowbird in 1993.  He became a full-time temporary employee in about 1996 and worked out of the Champaign facility.  There were three full-time temporary employees at Champaign for the years 2003-04 and 2004-05.  He did not get one of the positions for the 2004-05 season, which was the first season for which he was interviewed. Tim Duitsman applied for and received a full-time temporary position for the 2006-07 season.

Barry Eakle began working for IDOT in 1988.  He was a snowbird for seven years and then a full-time temporary employee for nine years.  Eakle worked in Vermillion County.  When he was a snowbird, he worked out of the Phaethon storage facility.   When he was a full-time temporary

employee, he worked out of the Phaethon facility for three years and the Danville facility for six years.  Eakle was a full-time temporary employee out of Phaethon for the 2002-03 and 2003-04 seasons.  For the 2004-05 season, Eakle was interviewed by Hartke.  Eakle was not hired that season, though two additional full-time temporary employees were hired for Vermillion County.  Eakle applied for a position for the 2005-06 season.  No interviews for the position were conducted that year.  Instead, IDOT simply rehired the individuals they had hired for the previous year.

Doug Seimer started as a snowbird for IDOT in 2000.  He was first hired as a full-time temporary employee for the 2003-04 season.  Seimer worked out of the Phaethon storage facility.  He applied for but did not obtain a position for the 2004-05 season.  Hartke briefly interviewed Seimer for the position.  The four individuals who were hired as full-time temporary employees for the 2004-05 season were rehired for the 2005-06 season.  Seimer was rehired for the 2006-07 season.

Steve Knoll started working the winter program at IDOT in 1980.  He was a snowbird until 1988.  He left IDOT and came back in the early

1990's.  Knoll became a full-time temporary employee in either 1999 or 2000.  Hartke interviewed Knoll by phone for the position for the 2004-05 season.  Knoll was not hired that season.

Randy Johnson began as a snowbird in 1994.  He became a full-time temporary employee during the 1998-99 season.  Johnson was interviewed by Hartke in 2004, but was not hired for the 2004-05 or 2005-06 seasons.  Johnson was rehired as a full-time temporary employee for the 2006-07 season.

Phillip Travelstead started with IDOT as a snowbird in the 1992-93 season.  He was a snowbird for about three seasons and then became a full-time temporary employee.  He held that position from about the 1996-97 season through the 2003-04 season.  The first time Travelstead had to interview for the position was for the 2004-05 season.  He was not offered the position that year.  The interview was conducted by Mike Barone, who was the Administrative Manager for District 9 beginning in December of 2002.  Travelstead obtained a full-time temporary employee position for the 2005-06 season.

(C)

For the 2003-04 season, Robert Millette was involved in making a change to the application. As a result of the change, individuals such as the Plaintiffs were considered to have no more snow plowing experience than those individuals who had plowed snow for other governmental entities. The decision to make the change was made by Millette, Secretary Martin and Jacob Miller, who was IDOT's Bureau Chief of Personnel. This change was made even though Millette did not have any reason to believe that previous applicants were not sufficiently qualified to do the job. There is no evidence that the change resulted in IDOT getting better qualified candidates for the winter positions. The process changed for the 2004-05 season in that IDOT went to "Rutan" face-to-face interviews with the applicants. Millette was involved in the decision to go to the interview format. Millette recalls that the interview format was implemented for the 2004-05 season but does not recall why that change occurred. Although Doubet was in charge of establishing the interview format, it had to be approved by Millette and Martin.

10

Scott Doubet, one of the Defendants, became the Bureau Chief of Personnel Management in February of 2004. The Defendants allege that Doubet was concerned about hiring employees by way of someone in his office grading an application and looking at letters of recommendation without ever laying eyes on the individuals. In order to get what he believed would be the most qualified employees, Doubet recommended having each applicant for the winter program submit to an interview where he or she was asked questions which corresponded to specific criteria. Secretary Martin and Director Millette concurred. Based on their contention that the changes were made in order to remove people perceived to be Republicans from the full-time temporary positions in favor of those who were politically connected to the Democratic Party, the Plaintiffs dispute the previous two allegations pertaining to the hiring process. Secretary Martin did not know whether past hiring practices for the winter program had created any problems or had prevented IDOT from getting qualified candidates to apply.

When interviews were conducted, the interviewees should get the same scores if they gave the same answer to a given question. However, this

11

did not always happen.  Interviewee Jim Delattre was given 8 points for living 18 miles away from the yard, though Plaintiff Eakle lived 15 miles away from the yard but only got 7 points.  Richard Davis was given 8 points for indicating he could lift 50 pounds on a repetitive basis, though Plaintiff Travelstead only got 6 points for the same answer.  None of the interviewers provided an explanation for these discrepancies.

Charles Klein, who was IDOT's union resource manager for District 2 since 1985, testified that proper procedure for these interviews would be that the interviewer would be the one who would assign points to the interviewee's answer.  For the 2004-05 season, Klein did some of the interviews in Rock Island County.  Klein did not score the interviews that he conducted.  Matt Hughes, who did the other interviews in that county, scored Klein's interviews.  Hughes was the Administrative Services Manager for IDOT's District 2 office from June of 2003 to November of 2008.  In that capacity, he was in charge of all human resources, including hiring.

Hughes did not consistently score the answers given by the applicants interviewed by Klein.  For example, interviewee William Weatherly got 7

points for indicating he drove on his CDL license about 10,000 miles per year but another individual only got 6 points for the same answer.  Weiss was also scored lower in other categories even though he had the same or better answers to the questions.  Hughes is a Democrat.  Hughes could only speculate as to why scores given to interviewees was not consistent.

Scott Doubet started working for IDOT on February 1, 2004.  He worked there until April 24, 2009.  From March 1, 2003, through February 1, 2004, he worked out of the Governor's office.  While working out of the Governor's office, he was a personnel liaison to a variety of agencies including IDOT.  While at IDOT, Doubet was the Bureau Chief of Personnel Management.  It was Doubet who came up with the idea of doing interviews for the full-time temporary positions for the 2004-05 season.  He did this because he felt "uncomfortable" with the way it had been done in the past.  However, he does not really know how it was done previously.  Although it was Doubet's idea to change to the "Rutan" interview format, he had to get approval from Defendant's Martin and Millette.

(D)

13

The 2004-05 Winter Program hiring process was done primarily at the district level.  Applications were to be submitted to the districts.  Interviews were conducted by trained interviewers from the district.  District staff also were responsible for scoring the applicants' interview responses, and submitting paperwork to Doubet's office showing which candidates' ranks supported their selection for each vacant position (i.e. top five scores selected for five vacancies).  The offer of a position to an applicant was a function of the interview scores and the number of available positions.  The Plaintiffs contend, however, that the system was established to oust those perceived to be Republicans in favor of those supported by the Democratic party.  The Defendants assert that, based on this process, other applicants who scored higher than the Plaintiffs were offered the vacant positions.  The Plaintiffs claim that the positions were not awarded based on points given in a fair and objective manner.  They allege, moreover, that the process was established by Democrats for the purpose of ousting those perceived to be Republicans in favor of those supported by the Democratic party.

For the 2005-06 Winter Program, the decision was made to interview

applicants only where vacancies existed.  The Defendants assert that the decision to recall successful candidates from the 2004-05 Winter Program who had a successful evaluation was made primarily because of potential labor relations issues relating to the Teamsters' petition to represent the full-time, temporary employees.  The Plaintiffs dispute this allegation and claim that there is no evidence of record proving that the those employees were members of the Teamsters union at this time or that subsequent affiliation with the Teamsters had any actual or potential effect on hiring of full-time temporary employees for the 2004-05 Winter Program.  They assert that the record shows those employees were not in the Teamsters at that time. This "recall" of employees was a reversion back to the way full-time, temporary employees were selected for the 2003-04 season and prior years. Martin had to approve going back to this system.  Doubet does not know if the selection process used for the 2003-04 season resulted in getting the best qualified people.

The Defendants assert that they were not aware of the Plaintiffs' political affiliation(s) prior to being served with this lawsuit.  Moreover, the

Plaintiffs have no evidence that the Defendants were ever aware of their political affiliations (or lack thereof). The Plaintiffs dispute these allegations and claim that they would have understood Plaintiffs to likely have been affiliated with the Republican party due to the fact that Plaintiffs had initially been hired under Republican administrations.

The Defendants did not know anyone who was hired as a full-time temporary or hourly employee. The individuals responsible for interviewing and scoring interview responses testified that the Defendants did not talk to them about how to score specific candidates or otherwise whom to hire. The Defendants contend that the individuals responsible for interviewing and scoring interview responses, Josh Hartke, Chuck Klein, Matt Hughes and Mike Barone, did not know the political affiliations of the Plaintiffs or other applicants. However, the Plaintiffs again allege that those individuals would have understood the Plaintiffs to likely have been affiliated with the Republican party due to the fact Plaintiffs had initially been hired under Republican Administrations.

## III. ANALYSIS

16

(A)

The entry of summary judgment is appropriate when the pleadings,
depositions, answers to interrogatories, and admissions on file, together with
any affidavits, show that there is no genuine issue of material fact and the
movant is entitled to judgment as a matter of law.  Fed. R. Civ. P 56©;
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "Rule 56© mandates
the entry of judgment, after adequate time for discovery and upon motion,
against a party who fails to make a showing sufficient to establish the
existence of an element essential to that party's case, and on which that
party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at
322.  If a defendant can show the absence of some fact that the plaintiff
must prove at trial, then the plaintiff must produce evidence, and not
merely restate his allegations, to show that a genuine issue exists.  Sartor v.
Spherion Corp., 388 F.3d 275, 278 (7th Cir. 2004).  The Court construes
all facts and makes all reasonable inferences in favor of the non-moving
party.  Magin v. Monsanto Co., 420 F.3d 679, 686 (7th Cir. 2005).

An individual's affiliation with a political party is protected under the

First Amendment.  See Gunville v. Walker, 583 F.3d 979, 984 (7th Cir. 2009) (citing Rutan v. Republican Party of Illinois, 497 U.S. 62, 64 (1990)).  However, "where party loyalty is necessary to effectively perform a job, the First Amendment does not prohibit the administration from firing an employee based on party affiliation."  Powers v. Richards, 549 F.3d 505, 509 (7th Cir. 2008).  Obviously, political affiliation would not be an appropriate consideration for the IDOT jobs held by the Plaintiffs.

In order to make out a prima facie case, "public employees must present evidence that (1) their speech was constitutionally protected; (2) they suffered a deprivation likely to deter free speech; and (3) their speech caused the employer's action."  Gunville, 583 F.3d at 983.  Thus, the Plaintiffs must first show that the Defendants knew of their political affiliation.  See id. at 984.  Until recently, plaintiffs could prevail in a First Amendment section 1983 action by showing that their speech was a motivating factor in the employment decision.  Since the Supreme Court's recent decision in Gross v. FBL Financial Services, Inc., __ U.S. __, 129 S. Ct. 2343 (2009),  a plaintiff must demonstrate but-for causation in order

to meet his burden.  See Fairley v. Andrews, 578 F.3d 518, 525-26 (7th Cir. 2009).

(B)

Plaintiffs Downs, Gary Duitsman, Tim Duitsman, Eakle, Johnson, Knoll, Seimer, Travelstead and Weiss all testified that they had no specific facts or information which would indicate that any of the Defendants knew of their political affiliations.

Secretary Martin testified that he did not know most of the Plaintiffs and was not aware any of their political affiliations.  Millette also testified that he did not know any of the Plaintiffs.  He stated that he did not recall having discussions with Martin or Doubet about the political affiliations of any of the candidates.  Moreover, Millette testified that he did not recall having discussions with the other Defendants about how the face-to-face interview process might affect political affiliation.

Robert Millette did testify that he recalled general discussions about placing Democrats in the full-time temporary positions.  From these discussions, Millette inferred that Republicans had been holding these

positions.   In fact, he "was told that by anybody that had a mouth." However, Millette could not recall specifically who made these statements. Based on the "scuttlebutt around the office," Josh Hartke also concluded that these positions seemed to be political hires in previous administrations.

Doubet testified that he never had discussions with Millette or Martin about wanting to hire more Democrats for these positions.   Moreover, Doubet stated that he did not know that those who held the positions in the previous ten or twelve years were more likely to be affiliated with the Republican Party.

The Plaintiffs point to testimony from Laura Norton, who stated that Doubet wanted the Republicans to be fired.   Doubet did not mention any specific positions.   Norton testified that based on these conversations, she understood that it was a goal of the Governor's Office of Personnel to get rid of Republicans and replace them with Democratic loyalists.   Norton did not recall Doubet mentioning specific employees.   The Plaintiffs also cite testimony from IDOT employee Tom Kelso, who stated that Doubet's desire to fire Republicans at IDOT was well-known.   Kelso further testified

that, while at IDOT, Doubet maintained on his computer a list of Republican holdovers who were targeted for termination. No specific names or positions are mentioned.

Based on the foregoing, there does not appear to be evidence that any Defendant had specific knowledge as to any particular Plaintiff's political affiliation. However, it does appear that at least some of the Defendants had general knowledge of their affiliations–or at least believed the Plaintiffs to be Republicans. Given the nature of this type of evidence, the Court concludes that this general knowledge is sufficient to raise a factual dispute about whether the Defendants had knowledge of the Plaintiffs' political affiliations.

(C)

The Defendants contend that they are entitled to summary judgment because the Plaintiffs cannot show that Defendants were personally involved in any alleged constitutional deprivation. Personal involvement is required in order to impose liability under any section 1983 claim. See Walker v. Peters, 233 F.3d 494, 498 (7th Cir. 2000). A defendant need not directly

participate in the deprivation.  See Rascon v. Hardiman, 803 F.2d 269, 274 (7th Cir. 1986).   "An official satisfies the personal responsibility requirement of section 1983 if she acts with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent."  Id.

The Plaintiffs do not contest the Defendants' assertion that Brian Piersma, as Section Manager in the Bureau of Personnel Management, was not in any manner involved in the Winter Program for the 2004-05 or 2005-06 seasons.  Consequently, Piersma is entitled to summary judgment as to the Plaintiffs' claims.

Martin, Millette and Doubet were involved in the decision to have all applicants for the 2004-05 Winter Program submit to interviews.  The Plaintiffs contend that an objectively reasonable jury could see through the Defendants' excuses for changing the hiring protocol of seasonal workers and conclude that the Defendants proffered reasons for the change were merely a pretext for getting rid of the old party loyalists and bringing in the

new ones.

As the Defendants note, however, they were not involved in the implementation of the process.  The Plaintiffs do not dispute the Defendants' assertion that the individuals responsible for interviewing and scoring interview responses testified that the Defendants did not talk to them about how to score specific candidates or otherwise whom to hire. Moreover, the individuals responsible for interviewing and scoring interview responses–Josh Hartke, Chuck Klein, Matt Hughes, and Mike Barone–did not know the political affiliations of the Plaintiffs or other applicants.  The Plaintiffs purport to dispute that fact by alleging that Defendants understood Plaintiffs to likely have been affiliated with the Republican Party because they had initially been hired under Republican Administrations.  The allegation is not properly disputed, however, because the interviewers are not Defendants in this case.[1]

---

[1]Josh Hartke's status is not entirely clear.  He is listed in the caption as a Defendant.  On January 29, 2007, a Request for Waiver of Service and Notice of Lawsuit was sent to Hartke.  The docket does not indicate that the Request was ever returned executed.  The only other specific docket activity involving Hartke is a notation on July 15, 2009, that he has been added as a party and the docket would be updated accordingly.  However, it does not appear that Plaintiffs ever effected formal service in a manner authorized by the Federal Rules of Civil Procedure, after

The Plaintiffs' main argument seems to be that the hiring system for seasonal workers worked well until the Blagojevich administration. Applicants like the Plaintiffs were well-qualified and there was no reason to make any changes to the process.  The new method, which included face-to-face interviews and standardized testing, resulted in the Plaintiffs not being hired, though they claim that they were the applicants with the most experience in their respective counties.  In the Argument section of their brief, the Plaintiffs spend considerable time discussing the benefits of the old system and criticizing the new one.  Although several of the Plaintiffs' points may have merit, it is not the role of a federal district court to determine whether IDOT was wise to change the hiring process for the positions held by the Plaintiffs.  The Court's only inquiry is whether the process was unconstitutional.  Courts do not sit as super-personnel boards determining the best way to hire employees.  See Brewer Board of Trustees of University of Illinois, 479 F.3d 908, 922 (7th Cir. 2007).

Even when the facts are viewed in the light most favorable to the

Hartke failed to return the Request for Waiver of Service and Notice of Lawsuit. Thus, it appears that Plaintiffs have abandoned their claims against Hartke.

24

Plaintiffs, it appears that the involvement of Secretary Martin is limited to signing off on the new procedure for hiring seasonal employees. The same seems to be true as to Millette. Doubet's involvement was more significant, in that it was he who proposed the new hiring process. The Plaintiffs have established that the process may have been flawed. However, that does not mean it was unconstitutional.

The Plaintiffs' response brief discusses the "scheme" which they allege was perpetuated by the Defendants. The problem with this argument is that, based on the evidence before the Court, the Defendants' involvement is limited to devising and implementing a hiring process. Whatever the program's merits or flaws, the Plaintiffs have not articulated how it is unconstitutional. The Defendants correctly note that they cannot be held liable under section 1983 on a theory that their subordinates manipulated the hiring process. See Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1948 (2009). The Plaintiffs must show that each Defendant, "through the official's own individual actions, has violated the Constitution." See id. They are unable to make that showing.

25

Most of the Plaintiffs' specific complaints are directed at the way the interviews were conducted and evaluated.  However, the interviewers were not aware of the Plaintiffs' political affiliations.  The Plaintiffs have pointed to no evidence that there was any collusion between the Defendants and the non-party interviewers.  In fact, the interviewers testified that there was no discussion  from the Defendants about how to score the candidates or otherwise whom to hire.  The Plaintiffs speculate as to the Defendants' motives, but present no competent evidence disputing these allegations.

The Plaintiffs even acknowledge it is arguable that hiring full-time temporary employees at IDOT through the <u>Rutan</u> interview process is a legitimate way to insure that the best candidates are hired.  That is, if the <u>Rutan</u> procedure is actually followed.  The Plaintiffs claim that it was not. Once again, however, the Defendants cannot be held liable because of how their subordinates conducted the interviews.

The Court concludes that Plaintiffs are unable to create a genuine issue of material fact as to the Defendants' personal involvement in the alleged First Amendment violations.  The establishment of a hiring process

by the Defendants is simply too far removed from the alleged deprivation, when there was nothing unconstitutional about the process itself.

Accordingly, the Plaintiffs have not shown that there is a factual issue regarding whether, but-for their political affiliations, they would have been hired as full-time temporary employees for the 2004-05 season.

## IV. CONCLUSION

There may have been problems with the hiring process that was implemented at IDOT.  The Plaintiffs have pointed to interviews that appeared to be cursory and inconsistently scored, to cite a couple of examples.  However, the process itself was neutral.  Moreover, there is no evidence that the Defendants were involved in the interviewing or scoring of candidates that resulted in the Plaintiffs receiving low scores and non-selection for the positions.  After viewing the evidence in a light most favorable to the Plaintiffs, the Court concludes that because the Defendants were not involved in those hiring decisions, the Plaintiffs are unable to create a genuine issue of material fact that they did not receive the positions because of their political affiliations.

Ergo, the Defendants' motion for summary judgment [d/e 24] is ALLOWED.

The Clerk will enter judgment in favor of the Defendants and against the Plaintiffs.

ENTER: January 26, 2010

FOR THE COURT:

s/Richard Mills
United States District Judge

28